**UNITED STATES of America, Plaintiff,**

v.

**Anthony CAPANELLI, Defendant.**

**No. 01 CR. 1121(CSH).**

United States District Court, S.D. New York.

July 14, 2003.

James B. Comey, United States Attorney, for the Southern District of New York, Office of the United States Attorney (Matthew L. Biben, Esq., Edward C. O'Callaghan, of counsel), New York City, for Plaintiff.

Edward W. Hayes, Esq. (Rae Koshetz, Esq., of Counsel), New York City, for Defendant.

## MEMORANDUM OPINION

HAIGHT, Senior District Judge.

Following a jury trial, defendant Anthony Capanelli was convicted of conspiring to commit armed robbery. At the conclusion of the sentencing hearing conducted on June 16, 2003, the Court ruled from the bench that, *inter alia,* it would not accept the Probation Department's recommendation expressed in the Pre–Sentence Report ("P.S.R.") that the offense level calculated under the United Sentencing Guidelines ("U.S.S.G." or "the Guidelines") be increased by five levels because the loss intended by the conspirators exceeded $ 1,500,000. *See* U.S.S.G. § 2B3.1(b)(7)(F). Instead, the Court declined to make any enhancement under that section of the Guidelines. In making that ruling, the Court sustained an objection to the P.S.R. made by defendant and rejected the arguments of the government. This opinion amplifies the reasons for that ruling expressed by the Court at the hearing.[1]

## I. BACKGROUND

The original indictment in this case, No. 01 Cr. 1121, charged Capanelli and eight other defendants. The indictment contained twelve counts. Capanelli was charged only in Counts One and Two. Count One charged Capanelli and some of the other defendants with conspiring "to rob The New York Times Company of payroll money," ¶ 6, in an amount of "more than $6 million," ¶ 5. Count Two charged Capanelli and the other defendants with attempting to commit the robbery described in Count One.

The case was assigned to the late District Judge Allen G. Schwartz. All other defendants pleaded guilty before Judge Schwartz. Judge Schwartz sentenced most of them before his death. Capanelli declined to plead and went to trial before a jury and the undersigned, to whom the case was reassigned shortly before Judge Schwartz died.

Capanelli was tried not on the original indictment but on a four-count superseding indictment, S1–01 Cr. 1121, filed on January 29, 2003, in which he was the only defendant charged. Count One charged that Capanelli and others conspired "to rob The New York Times Company of payroll money" in an unspecified amount. ¶ 6. Count Two charged Capanelli and others with attempting to commit the robbery described in Count One. Count Three charged Capanelli and others to take by violence and intimidation "hundreds of thousands of dollars belonging to The New York Times Federal Credit Union" located at The New York Times facility in College Point, Queens, New York, ¶ 11, in violation of 18 U.S.C. § 2113. This is a notable devaluation of the original indictment, which charged an intended theft of "more than $6 million in stolen payroll money," ¶ 5, rather than "hundreds of thousands of dollars." Count Four charged Capanelli and others with attempting to commit the offense described in Count Three.

The jury acquitted Capanelli on Counts One, Two, and Four, but convicted him on Count Three. In its Guidelines calcula-

---

1. The sentencing briefs of the parties raised a number of additional issues. The Court's reasons for its rulings on those issues and for the sentence imposed are adequately stated in the transcript of the sentencing hearing ("Tr.").

tions on that count of conviction, the P.S.R. determined that Capanelli's criminal history category was I, reflecting the fact that he had no prior convictions, and that the offense level was 29, resulting in a sentencing range of 87 to 108 months. The P.S.R. recommended a sentence of 87 months.

Since Capanelli was convicted of a conspiracy, the P.S.R. began its computation of the Guidelines offense level by referring to U.S.S.G. § 2X1.1(a), which requires the application in a conspiracy case of "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." The substantive offense was a violation of 18 U.S.C. § 2113 and the applicable Guidelines are found in U.S.S.G. § 2B3.1(a), which provides for a base offense level of 20.

U.S.S.G. § 2B3.1(b)(7) mandates that the base offense level of 20 be increased according to a sliding scale dependent upon the amount of the loss (actual in a sentence for committing the substantive offense, intended in a sentence for conspiracy). Specifically, § 2B3.1(b)(7) provides: "If the loss exceeded $10,000, increase the offense level as follows: (A) $10,000 or less no increase." There follows a list of level increases which themselves increase as the amount of the loss increases. When one arrives at subsection (F), an amount of "more than $1,500,000," the mandated increase to the offense level is 5 levels. That is the amount used by the P.S.R.[2] The P.S.R.'s explanation for that amount is contained in ¶ 32, which reads in its entirety:

While the Government was unable to provide specific information regarding the intended loss, it is estimated that the defendants intended to steal between $2 million and $6 million. Given the inexact measure of potential loss, we have increased the base offense level by an additional five levels pursuant to § 2B3.1(b)(7)(F).

The P.S.R. gives no further particulars to explain its estimate of the amount that it refers to as the "intended loss" and the "potential loss." Defendant challenged the resulting five-level increase in the base offense level. The government defended it.

## II. DISCUSSION

### A. The Sentencing of Other Participants

█ I will consider at the outset the government's reference to the sentences Judge Schwartz passed upon four defendants, included with Capanelli in the original indictment, who pleaded guilty to the conspiracy before him. While those sentences and the plea agreements and allocutions which presumably preceded them have not been furnished to me, it appears that in each case Judge Schwartz accepted the estimate that the intended loss was more than $1,500,000. That placed the government in the position to argue at Capanelli's sentencing that this Court should "defer to the *finding* that Judge Schwartz made with four other defendants in this case, and the recommendation of the Probation Department in regard to this defendant that the loss amount of 1.5

---

2. The sliding scale, or grid, provides in pertinent part for no increase in the base offense level if the loss was $10,000 or less, subsection (A); add 1 level for an amount "more than $10,000," subsection (B); add 2 levels for an amount "more than $50,000," subsection (C); add 3 levels for an amount "more than $250,000," subsection (D); add 4 levels for an amount "more than $800,000," subsection (E); and add 5 levels for an amount "more than $1,500,000," subsection (F). The subsequent additions of levels increase with the specified amounts.

million dollars was appropriate." Tr. 19 (emphasis added).

I do not believe that Judge Schwartz made any "findings" on the point in the traditional sense, that is to say, a judicial resolution of a disputed factual issue. It is fair to assume that each of the defendants who pleaded before Judge Schwartz had previously entered into a written plea agreement with the government. While there are occasional exceptions, it is the customary practice in this district for such plea agreements to contain a stipulated Guidelines range reciting the offense level and criminal history category to which the government and the defendant have agreed. If that practice was followed in this case, it is highly unlikely that Judge Schwartz engaged in an independent analysis resulting in a "finding" that the estimated amount of the intended loss was proper. Of course, he had the power to do so, notwithstanding the parties' assumed agreement on the point; and Judge Schwartz did not believe in the Potted Palm concept of judging, any more than I do. But judges almost invariably (and quite properly) accept agreed sentencing ranges; and if that is what occurred with respect to the four defendants Judge Schwartz sentenced, it is a stretch for the government to argue that he made "findings" on the point at issue. In seeming contrast to the defendants who pleaded guilty before Judge Schwartz, Capanelli objects to the Probation Department's estimation of the amount of the intended loss; and in resolving that dispute, I write upon a clean slate.

## B. Standard of Review

■ The government bears the burden of proving the amount of loss that triggers a particular offense level increase under U.S.S.G. § 2B3.1(b)(7). *See United States v. Vasquez,* 791 F.Supp. 348, 353 (E.D.N.Y. 1992) (Weinstein, *J.*) ("The government proved that the conspirators had agreed to steal an armored van which they believed might be loaded with cash. But there was a failure of proof as to the amount the conspirators 'intended' to steal within the meaning of the Guidelines, since there was no evidence of what was or would be in the van.").

■ As noted in Part I, *supra,* U.S.S.G. § 2X1.1(a) provides that the base offense level for a conspiracy is the Guideline base offense level for the substantive offense that was the objective of the conspiracy, "plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." It seems plain enough that this language includes the offense level adjustments contained in § 2B3.1(b)(7). Therefore I conclude that in the case at bar, the government bore the burden of proving the amount of the intended loss "with reasonable certainty." [3] The question is whether the evidence and lack of evidence at trial justify the conclusion that the government has done so.

## C. The Trial Evidence

The trial evidence showed that a federally insured credit union was maintained on the premises of the New York Times printing and distribution facility in College Point, Queens. Having said that, I have

---

**3.** The phrase "reasonable certainty" creates an objective test. Subjectively, one may be certain that a proposition is true which is in fact false. Hence the possibly apocryphal description of a lower court judge: "Not always right, but never in doubt." The modifying adjective "reasonable" assures that the "certainty" is objectively sound; the phrase is the converse of "reasonable doubt." I need not pursue this exercise, since however the phrase is parsed, for the reasons stated in text the government has not met its burden.

recited the entirety of the evidence about the credit union. The government did not call any witness to testify about the functions of the credit union, the services it rendered to members, its physical location and dimensions, and, most significantly, the credit union's practice with respect to the amount of cash it kept on hand at the College Point facility.

Taxed with that lack of evidence during the sentencing hearing, the government responded that "the reason we haven't put that evidence forward, that is more specifically what was contained in the credit union, is because our intended victim has expressed reluctance to have that information made public." Tr. 29.

The government was entitled to yield to that reluctance, although certainly it did not need to; the witness could have been subpoenaed, and no evidentiary privilege barring the pertinent testimony is apparent.

Accordingly, having foresworn the principal and most logical source of direct evidence about the amount of cash kept at the credit union office in the Times's College Point plant ("Sure," one can imagine the hypothetical manager of the credit union testifying, "we always had between $ 2 million and $ 6 million in cash on hand every day and night of the week"), the government had to rely upon indirect sources, which I will now examine.

It is apparent from its letter brief on sentencing issues that the government's effort to prove the intended amount of the Times payroll robbery depends principally upon the declarations of Nicholas Fiorello. Fiorello was one of the conspirators who pleaded guilty before Judge Schwartz. He did not testify at trial. Fiorello's declarations are contained in a number of record-ed conversations between certain of the conspirators, as well as Frank Smith, an undercover detective, and another individual who was a cooperating witness.[4] Smith also testified at trial about conversations in which Fiorello participated.

The government, questioning Smith about a recorded conversation in which Fiorello participated, asked: "Did Mr. Fiorello indicate how much money he believed was available during the big score?" Smith answered: "Between 2 and 6 million." Trial Tr. 86; Govt. Ex. 20–T at 6. Describing a subsequent conversation, Smith was asked: "Detective Smith, when Nick Fiorello says, he said it's close to two ... what is your understanding of who Nick Fiorello was referring to?" Smith replied: "Anthony, the inside guy he has at the New York Times." Trial Tr. 194. These are the two pieces of testimony the government quotes in its letter brief. I may also infer that they form the basis for the statement in ¶ 31 of the P.S.R., quoted *supra*, that "it is estimated that the defendants intended to steal between $2 million and $6 million."

The government also cites to five exchanges culled from the tapes of four recorded conversations, prefaced by the phrase "see also." In the first of these, the cooperating witness asks Fiorello: "What do you think the numbers are? What kind of money?" Fiorello replies: "He said close to two." The cooperating witness says: "Closer to two million," and Fiorello responds: "Yea." Govt. Ex. 23–T at 12.

In the second exchange, a conspirator asks Fiorello: "How much money we talking about here?" Fiorello replies: "Over two million." The cooperating witness intercedes to say "Two and a half," and

---

4. Parts of these recordings were received as government exhibits at the trial and were played to the jury, which also received typed transcripts accompanied by appropriate limiting instructions.

Fiorello responds: "Maybe two million, maybe more." The cooperating witness, energetically playing his part as a conspirator, volunteers that "they come in on a Monday with the armored car" and "then they start cashing the checks on Tuesday, in the morning," which prompts a genuine conspirator to say: "That means we gotta get there Monday night." Govt. Ex. 24–T at 3.

In the third exchange, the cooperating witness primes the pump by saying "but the way I'm looking at is if we do it right ..." and a conspirator finishes his sentence: "Yeah, we do it right, we get the two and a half million, we get ourselves a nice paycheck." Govt. Ex. 24–T at 5.

In the fourth exchange, a genuine conspirator says of the proposed robbery: "I believe it's a wonderful thing. I bet there's over a million in there." Govt. Ex. 29–T at 8.

In the fifth and final exchange, the logistics of the robbery are being discussed, and the cooperating witness says "that's what we figured, we figured about six guys," to which Fiorello responds: "Yeah, a million to two million in the safe, when they deliver the money." Govt. Ex. 33–T at 8.

While this is the evidence the government cites as proving with reasonable certainty that the genuine conspirators intended to steal an amount in excess of $1.5 million, thereby triggering the five-level offense increase called for by U.S.S.G. § 2B3.1(b)(7)(F), there is additional pertinent testimony by detective Smith, in answer to questions by the Court. The Court read to Smith this portion from one of the recorded conversations; the speaker is Fiorello, who is describing the physical layout of the credit union at the Times College Point facility:

> In the cashier box, it's in box [sic ], it's like a bread box, an old bread box where they keep the bread, where the bread, it's like a bread box. Fucking screw driver pops it right off it. Behind them is a door where it opens 90 [sic ]—24 hours a day nonstop, seven days a week, never closes. They're so fucking relaxed it is a sin in the safe. There's anywhere from two to $6 million in that room.

The Court then asked Smith:

> Was it your understanding that what Nicky was saying was that there was a room in the New York Times that was open 24 hours a day, seven days a week where they kept two to six million dollars in an open safe?

Smith's answered generally, if not precisely, in the affirmative. This testimony then transpired:

> THE COURT: Did you make an attempt to check out whether that was true?
>
> A. As the undercover, it would have been impossible for me to—
>
> THE COURT: Do you know if anyone else ever checked it to find out if that was true?
>
> A. I'm not sure.

Trial Tr. 450–51.

I must now consider whether this record shows that the government has carried its burden of proving to a reasonable certainty that the conspirators "intended," as that concept is defined by the Guidelines, to steal an amount in excess of $1.5 million.

## D. The Guidelines' Definition of an "Intended" Loss

I have previously quoted U.S.S.G. § 2X1.1(a), which provides that the base offense level for the crime of conspiracy will be that for the substantive offense, "plus any adjustments from such guideline for any *intended* offense conduct that can be established with reasonable certainty" (emphasis added). The Guidelines concept

of "intended" offense conduct is clarified by Comment 2 to § 2X1.1, which reads in pertinent part:

> "Substantive offense, as used in this guideline, means the offense that the defendant was convicted of soliciting, attempting, or conspiring to commit." Under § 2X1.1(a), the base offense level will be the same as that for the substantive offense. But the only *specific offense characteristics* from the guideline for the substantive offense that apply are those that are determined to have been *specifically intended* or actually occurred. Speculative specific offense characteristics will not be applied. For example, if two defendants are arrested during the conspiratorial stage of planning an *armed bank robbery*, the offense level ordinarily would not include aggravating factors regarding *possible* injury to others, hostage taking, discharge of a weapon, or *obtaining a large sum of money*, because such factors would be speculative.

(emphasis added). Obviously, the Comment's discussion, with its particular reference to a bank robbery conspiracy, supports Capanelli's position. The government professes to find comfort in the modifier "ordinarily," but its argument fails in the face of the Guidelines' symmetry. Limitations which apply *ordinarily* may be disregarded if the circumstances are *extraordinary;* and the boundary lines between what is ordinary and what is extraordinary with respect to the sum of money as an aggravating factor in an intended robbery are clearly drawn by U.S.S.G. § 2B3.1(b)(7), which provides for graded increases in the base offense level for robbery if the government proves to a "reasonable certainty" that the conspirators had the "specific intent" (again quoting Comment 2 to § 2X1.1) to steal an amount of money in excess of specific amounts.

■ As Judge Weinstein's opinion in *Vasquez,* 791 F.Supp. 348, illustrates, for Guidelines calculation purposes conspirators' "specific intent" to steal a specific amount of money is not a free-flying and rudderless balloon. The amount must be grounded in the realities to be deduced from the trial record, and it is the government's burden to prove those realities. For example, if conspirators were sufficiently wicked to agree to rob a child selling lemonade at the end of her parents' driveway for 5 cents a glass, the conspirators might declare their unanimously held specific intent to steal an amount in excess of $1.5 million, thereby (the government might argue) triggering the five-level adjustment the government wishes to impose upon Capanelli, but the trial record would not allow it.[5] The government may say the facts of the case at bar are different, and so they are, up to a point, but the principle is the same. In order to apply any particular level increase under § 2B3.1(b)(7), the government must point to credible evidence in the record establishing the possibility (at the very least) that the repository of the targeted funds (be it a lemonade stand or, as in *Vasquez,* an armored car, or a credit union) contained the amount that the conspirators "intended" to steal within the meaning of the Guidelines.

That principle underlies *Vasquez,* where the conspirators agreed to steal currency from an armored car "which they hoped would be at least $5,000,000," 791 F.Supp. at 349. The government argued for a seven-level increase based on that amount. Judge Weinstein rejected that contention because "there was no proof that the conspirators 'intended,' within the meaning of the Guidelines, to take a specific amount

---

5. This example assumes, perhaps fancifully, that the lemonade-selling child's business affected interstate commerce, thereby federalizing the conspiracy under the Hobbs Act.

from the armored van." *Id.* at 353. "This is not to say," Judge Weinstein continued, "that the government must show that conspirators know exactly how much money they will acquire if the conspiracy succeeds." *Id.* But the conspirators' hopes and uninformed beliefs were not sufficient to justify an increase in the offense level based upon a particular amount. Judge Weinstein reasoned:

> There was evidence that the defendant and his conspirators discussed their hope of recovering $5,000,000 or perhaps even more than $5,000,000 as a result of the conspiracy. The government proved that the conspirators had agreed to steal an armored van which they believed might be loaded with cash. But there was a failure of proof as to the amount the conspirators "intended" to steal within the meaning of the Guidelines, since there was no evidence of what was or would be in the van.... [N]o proof established that the conspirators "intended" to steal $5,000,000. Assessing an amount as a basis for an increase in offense levels would be speculative under such circumstances. Defendant is *entitled* to a finding that he intended to steal the least amount recognized by the Guidelines–up to $10,000.

*Id* at 353–54 (emphasis added).

■ Judge Weinstein's reference to a defendant's entitlement in such circumstances to the least amount on the scale is apt. The government has the burden of proving an amount in excess of that least amount. If the government does not prove an amount in excess of $10,000, there is no basis for increasing the offense levels; it necessarily follows that the defendant is entitled to be sentenced in accordance with the basic offense level, which results from the application of U.S.S.G. § 2B3.1(b)(7)(A), which provides for "no increase" in the offense level if the intended loss was "10,000 or less."

## E. The Failure of the Government's Proof in This Case

■ In the case at bar, the government failed to prove that the conspirators "intended" to steal over $1.5 million, or any other specific amount, from the Times Credit Union, within the meaning of the Guidelines protocol. The government proved no more than hopes and uninformed beliefs, which are insufficient in law to carry its burden of proof up to a reasonable certainty. I find Judge Weinstein's analysis in *Vasquez* to be both pertinent and persuasive.

Most of the references to amounts in the millions available for stealing from the College Point plant's credit union came from the lips of Nicholas Fiorello, who the recorded conversations reveal to be a braggart and organized crime name dropper. But Fiorello was never employed at the Times College Point facility. He had no personal knowledge of how the plant operated, including the operation of the credit union.

The evidence can be read to identify Anthony Capanelli, the "inside guy" recruited by Fiorello, as the source for Fiorello's statements that the credit union customarily had on hand an amount between $2 million and $6 million. But the evidence showed that Capanelli, a pressman, divided his time between the Times printing plant in Queens and the New York Post's plant in lower Manhattan. More to the point, there was no evidence that Capanelli even used the services of the Times credit union, let alone that he acquired knowledge as to how much cash the credit union kept on hand in the normal course of its business. One would not think that the credit union posted such information on the notice boards scattered about the building.

Quite apart from that deficiency in the government's proof, the notion of a credit union's retaining so much cash on hand is

counterintuitive. As noted *supra*, the government offered no evidence from a knowledgeable witness about the credit union ands its operations. But I may perhaps judicially notice (without committing the cardinal sin of speculation) what employees' credit unions traditionally do. They cash employees' pay checks and they make loans to credit union members. With respect to the lending function, presumably the Times credit union did not hand out loan proceeds in cash at the College Plaint plant; it is more likely that the credit union gave the borrower a check in return for appropriate documents. As for cashing employees' pay checks, there is no evidence about how many Times employees used the College Point credit union for that purpose, but undoubtedly some deposited or cashed their checks elsewhere; and it seems fanciful to suppose that, notwithstanding the legendary effectiveness of the printing trade unions, the checks that some of the employees cashed at the credit union were of such large amounts as to require the credit union to keep over $1.5 million on hand to cash employees' pay checks, even on pay day.[6] But I need not continue further in this vein, because in any event the government failed to meet its burden of proof.

The government's fall-back position at the sentencing hearing was to remind the Court that U.S.S.G. § 2B3.1(b)(7) "has a grid, as do the rest of the Guidelines, which include a number of other loss amounts," and to ask: "Is the Court saying in light of the evidence presented that you could not make a determination that there was, for example, more than $50,000 that was the intended loss of these conspirators?" Tr. 30. That was in effect an invitation for the Court to "pick a number, any number," so long as it enhanced Capanelli's sentence; and I declined the invitation for the reasons Judge Weinstein stated in *Vasquez.* The government having failed to prove that Capanelli's sentence should be adjusted on the basis of any particular amount, he was entitled to be sentenced in accordance with the least amount on the grid. Any alternative loss amount I might have selected for sentencing purposes would have been entirely speculative and consequently unacceptable.

For the foregoing reasons, I held that Capanelli's offense level would not be increased by five levels pursuant to U.S.S.G. § 2B3.1(b)(7)(F).

---

6. These reflections give rise to the thought that the government was closer to the mark when it charged in the superseding indictment that Capanelli joined a conspiracy to steal "hundreds of thousands of dollars" from the Times credit union. Following Capanelli's conviction on that charge, the government seemingly suggested to the Probation Department that the amount be increased to over $1,500,000 and, having achieved that figure, sought to defend it at the sentencing hearing, but for the reasons stated in text there is insufficient evidence in the record to justify that amount, or indeed, any other specific amount.