**Carmine RUSSO, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

Nos. 01 CR 1121, 03 CV 9806.

United States District Court, S.D. New York.

April 5, 2004.

Carmine Russo, Lewisburg, PA, Pro Se Litigant.

## ORDER DENYING MOTION TO CORRECT SENTENCE

MCMAHON, District Judge.

On May 23, 2002, Carmine Russo pleaded guilty before the Honorable Allen G. Schwartz, to Count One of Indictment 01 CR 1121, charging him with conspiracy to commit robbery in violation of Title 18 Unites States Code, Section 1951. Russo pleaded guilty pursuant to the terms of a written plea agreement with the Government, dated May 15, 2002. (Exhibit A to Gov't. Motion). The plea agreement provided that Russo's right to appeal would be waived if he was sentenced within the stipulated guidelines range of 46 to 57 months. The guidelines calculation in the agreement included, "a five-level increase in the offense level ... because the intended loss was more than 1.5 million and less than 2.5 million, pursuant to U.S.S.G. § 2B3.1(b)(2)." (Government Response Exhibit A).

On September 4, 2002, Judge Schwartz sentenced Russo to 57 months imprisonment, a term of supervised release of three years, a fine of $7500, and a special assessment of $100. Russo did not appeal his conviction.

On November 12, 2003, Russo filed a motion pursuant to 28 U.S.C. § 2255 for correction of sentence on the ground that his court-appointed attorney rendered ineffective assistance of counsel. Russo claims that his counsel was ineffective in advising him to take a plea in light of the five level enhancement for intended loss contained in the plea agreement and for not challenging the Court's determination concerning the intended loss calculation.

*Petitioner's Writ is Time Barred*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides for a one-year period of limitations for a petitioner to file a petition under § 2255:

The limitation period shall run from the latest of—

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255.

■ Where no appellate review is sought, a conviction becomes final ten business days from the entry of the judgment of conviction (the deadline for filing a notice of appeal under Rule 4(b)(1) of the Federal Rules of Appellate Procedure). *See e.g., German v. United States,* 209 F. Supp.2d 288, 291–92 (S.D.N.Y.2002); *Martinez v. United States,* 2000 WL 863121, at *1 (S.D.N.Y.2000). Russo was sentenced on September 4, 2002, and his judgment of conviction was filed that same day. His time to appeal expired on September 14, 2002. Therefore, his deadline to file a petition pursuant to § 2255 expired one year thereafter, on September 14, 2003. Russo filed his § 2255 petition on November 12, 2003. Accordingly, Russo's petition is barred by the AEDPA's one year statute of limitations. (*See e.g., Mandarino v. United States,* 1998 WL 729703, at *2 (S.D.N.Y. Oct.16, 1998)) (dismissing as "untimely" petition filed six weeks after expiration of statute of limitations); *Santana–Madera v. United States,* 1999 WL 30986 (N.D.N.Y. January 19, 1999) (Section 2255 petition filed 69 days after expiration of statute of limitations dismissed as untimely); *Bryant v. Eisenschmidt,* 10 F.Supp.2d 211, 212 (N.D.N.Y.1998) (Section 2255 petition filed 42 days after expiration of statute of limitations dismissed as untimely).

*Petitioner's Motion is Barred by the Plea Agreement*

■ Even if Russo's petition had been timely filed, it would still be barred by the plea agreement. In the written and signed plea agreement with the Government, petitioner explicitly agreed to waive his right to appeal, or litigate under Title 28 USC § 2255, any sentence imposed within or below the stipulated Guideline range of 46 to 57 months' imprisonment. That Guidelines range was arrived at using a stipulate loss figure of between $1.5 and $2.5 million. On September 4, 2002, petitioner was sentenced within the stipulated Guidelines range to fifty-seven months' imprisonment. Therefore, the instant petition violates the terms of petitioner's agreement with the Government.

■ The Second Circuit has repeatedly upheld the use of appeal waivers in plea agreements. *See United States v. Yemitan,* 70 F.3d 746, 748 (2d Cir.1995)(dismissing appeal of a sentence within stipulated Guidelines range where appeal was foreclosed by defendant's plea agreement); *United States v. Pipitone,* 67 F.3d 34, 39 (2d Cir.1995); *United States v. Schmick,* 21 F.3d 11, 12 n. 1 (2d Cir.1994)(per curiam); *United States v. Salcido–Contreras,* 990 F.2d 51, 51–52 (2d Cir.1993)(per curiam). The Circuit has specifically held that a waiver of a right to appeal in a plea agreement includes a waiver of a right to file a § 2255 petition challenging his or her sentence. *Pipitone,* 67 F.3d at 39. A § 2255 petition that merely attacks the merits of a sentence is barred if the petitioner previously waived his right to appeal a sentence that conformed to the terms of the plea agreement. *See Ramirez v. United States,* 963 F.Supp. 329, 330–332 (S.D.N.Y.1997). The operative inquiry in determining the validity of such a waiver is: (1) whether the defendant's waiver was knowing and voluntary, *Berkovits v. United States,* 1998 WL 289691 at *1 (S.D.N.Y. June 4, 1998); and (2) whether the sentence conformed to that expressed in the plea agreement. *See Ramirez,* 963 F.Supp. 329, 330–332 (S.D.N.Y. 1997).

After thoroughly explaining the important constitutional rights petitioner was

giving up if he pleaded guilty, Judge Schwartz proceeded to inquire into petitioner's understanding of the plea agreement and the stipulated guidelines therein:

THE COURT: Prior to signing this document, this plea agreement, did you read it?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you go over it with Mr. McMahon (petitioner's attorney).

THE DEFENDANT: We went over it

THE COURT: Did he explain to you what each and every provision of this plea agreement said and what it meant?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did he also tell you what the effect would be on you entering into such a written plea and entering a plea pursuant to this agreement?

THE DEFENDANT: Yes, your Honor.

THE COURT: Prior to signing the agreement, did you go with him, provision by provision, and explain to him what the agreement said and what it meant as to each provision?

MR. McMAHON: Yes.

THE COURT: Did you also explain to him what the effect or consequences would be of signing such an agreement?

MR. McMAHON: Yes, Judge.

THE COURT: Mr. Russo, the written plea agreement contains certain matters as to which you and the government have stipulated; that you have agreed to. I'll just briefly refer to a few of those. The plea agreement, page 2, sets forth your agreement with the government as to your offense level, and after establishing what the base offense level is and all the appropriate increases and decreases, the total offense level referred to is the applicable guidelines offense level is 21, that is what you and the government agreed. At the bottom of the Page 2 and continuing on to Page 3, you and the government have stipulated that your criminal history category is III. At Page 3, under C, you and the government have agreed that at that offense level and that criminal history category, that your stipulated sentencing guidelines range is 46 to 57 months.... Do you see all of those matters as to which you and the government have now stipulated or agreed?

THE DEFENDANT: I agreed.

(Transcript of Russo Plea Proceeding at 12–13).

Judge Schwartz also explored petitioner's understanding of the appeal waiver in the plea agreement:

THE COURT: This agreement also provides that if the Court sentences you within the stipulated sentencing guideline range of 46 to 57 months, you will have waived your right to appeal the sentence or litigate the sentence under Title 28 U.S.C., Section 2255/ or Section 2241. Do you understand that?

THE DEFENDANT: Yes your Honor, I do.

THE COURT: In fact the agreement states that at Page 4, in the last paragraph which begins: "It is further agreed: One, that the defendant will neither appeal or otherwise litigate under Title 28, United States Code, Section 2255 and/ or Section 2241, any sentence within or below the stipulated sentencing guidelines range set forth above, 46 to 57 months."

THE DEFENDANT: Yes, your Honor I do.

(Transcript of Russo Plea Proceeding at 14).

Finally, Judge Schwartz questioned Russo to ensure that no outside influences

or pressures affected his decision to plead guilty:

> THE COURT: ... Sir have you been induced to offer to plead guilty by reason of any promises or statements by anyone to the effect that you would get leniency or special treatment or consideration if you pleaded guilty instead of going to trial?
>
> THE DEFENDANT: No, Your Honor.
>
> THE COURT: Have you been induced to offer to plead guilty by any fear, pressure, threat or force of any kind?
>
> THE DEFENDANT: No your Honor.

*Id.* at 18.

There is no question that Russo fully understood and agreed to the stipulated guidelines range of 46 to 57 months in the plea agreement. Nor is there any question that he knowingly and voluntarily agreed not to appeal or otherwise litigate his sentence under § 2255, if sentenced within that range. Had Russo's petition been timely filed it would still be dismissed based on his waiver.

*Equitable Tolling*

█ Russo does not challenge the fact that his petition was filed untimely or that he waived his right to appeal when he was sentenced in accordance with the plea agreement. He argues, however, that this Court should nonetheless review the merits of his petition and grant the relief he requests because he is an "actually innocent" man.

█ The AEDPA's one-year limitations period is not jurisdictional and is subject to equitable tolling in "rare and exceptional circumstances." *Smith v. McGinnis,* 208 F.3d 13, 15 (2d Cir.2000). Usually, equitable tolling is available only when a petitioner can demonstrate that: (1) "extraordinary circumstances prevented him from filing his petition on time"; and (2) he "acted with reasonable diligence throughout the period he seeks to toll."

*Smith,* 208 F.3d at 17. Petitioner has not even attempted to make a showing of extraordinary circumstances. He argues instead that constitutional considerations dictate that this Court equitably toll the limitations period because he is "actually innocent."

It remains an open question whether the AEDPA's statute of limitation bars collateral review of a prisoner's habeas petition when he claims actual innocence. *Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir. 2003). In addressing this issue, the Second Circuit advised that district courts should consider the following questions sequentially: (1) Did petitioner pursue his actual innocence claim with reasonable diligence? (2) If petitioner did not pursue his claim with reasonable diligence, must an actual innocence claim be pursued with reasonable diligence in order to raise the issue of whether Constitution requires an "actual innocence" exception to the AEDPA statute of limitations? (3) If petitioner did pursue the claim with reasonable diligence or if reasonable diligence is unnecessary, does petitioner make a credible claim of actual innocence? (4) If petitioner does make a credible claim of actual innocence, does the United States Constitution require an "actual innocence" exception to the AEDPA statute of limitations? *Whitley,* 317 F.3d at 225–26.

Russo does not actually claim to be innocent of the crime for which he pleaded guilty-conspiring to rob the New York Times production plant payroll. He only asserts that he is "innocent" of intending a loss of between $1.5 million and $2.5 million. That does not necessarily preclude petitioner from attempting to make a showing of actual innocence; the Second Circuit has held that "actual innocence" can include not only innocence of the offense itself, but also cases where erroneous facts result in an improper increase of a

petitioner's sentence. *Spence v. Great Meadow Correctional Facility,* 219 F.3d 162, 171–72 (2d Cir.2000).

Petitioner's claim was apparently inspired by Judge Haight's finding concerning the sentencing of Anthony Campanelli- the only one of the five defendants charged in the planned Times heist not to plead guilty and go to trial.[1] In his written opinion regarding Campanelli's sentence, Judge Haight ruled that the Government failed to prove at trial that the money Campanelli intended to steal was actually available at the Credit Union to be stolen and therefore the intended loss amount was too speculative. *See United States v. Capanelli,* 270 F.Supp.2d 467, 475 (S.D.N.Y.2003).

At Campanelli's trial, the undercover detective, Detective Smith, was asked about his conversation with Nick Fiorello, "Did Mr. Fiorello indicate how much money he believed was available during the big score?" Detective Smith replied, "between 2 and 6 million." (Campanelli Tr. at 66; GX 20–T at 6). Detective Smith was also asked about another conversation concerning the source of the information of the "two" the coconspirators intended to steal, "Detective Smith, when Nick Fiorello says, he said it's close to two ... what is your understanding of who Nick Fiorello was referring to?" Detective Smith replied, "Anthony, the inside guy he has at the New York Times." (Campanelli Tr. at 194). In a taped conversation, Albanese tells Russo, "I believe it is a wonderful thing. I bet there is over a million in there." The discussion went on to describe how Albanese believes each of the workers in the plant makes over a $1,000 a week. (See Campanelli Tr. at 276–77, GX 29–T at 8). At a conversation at Katz delicatessen Russo, Albanese, Fiorello, Detective Smith and the confidential witness,

discussed the fact that they believed there could be as much as $2.5 million in the plant. (Campanelli Tr. at 213–14, GX 24–T at 3–4). During the discussion of the $2.5 million, Albanese asks when the New York Times brings personnel bring the money into the plant and when he learns that they do it on Monday, Russo states, "that means we gotta get there Monday night." (GX 24–T at 3). Russo later states: "Yeah, we do it right, we get the two and a half million, we get ourselves a nice paycheck." (GX 24–T at 5).

Although there was no testimony from Credit Union personnel as to the amount of cash that was on hand at the time of the planned robbery, the testimony did establish: that the plant had a federally insured Credit Union established by the New York Times for the College Point employees for their banking needs and to cash their paychecks, (Campanelli Tr. at 623); that there are approximately 650 full time employees at the College Point Plant and approximately 250 additional part-time or casual employees, (Campanelli Tr. at 590); that, "very few" of the full-time employees have direct deposit; that paychecks are issued to most of them at the plant, and that the Credit Union is open for 10 to 12 hours a day Monday through Friday. (Campanelli Tr. at 647–648). The Government states that it purposely did not elicit testimony about the exact amount of cash on hand at the New York Times plant, because representatives from the Times did not want to publicly disclose that information.

Judge Haight concluded that, since the Government did not prove how much, if any, money was actually on hand at the time of the planned heist, there could be no adjustment for intended loss. Judge Haight held that the statements of the coconspirators regarding their beliefs and

---

**1.** Like Russo, defendants Albanese, Savarese and Fiorello all pleaded guilty and received

the same five-level enhancement for the intended loss.

hopes of how much the "big score" would yield was too speculative to use in formulating the intended loss. *Capanelli*, 270 F.Supp.2d at 475. He reasoned:

> if coconspirators were sufficiently wicked to agree to rob a child selling lemonade at the end of her parent's driveway for 5 cents a glass, the coconspirators might declare their unanimously held specific intent to steal an amount in excess of $1.5 million, thereby (the Government might argue) triggering the five level adjustment the Government wishes to impose on Campanelli, but the trial record would not allow it.

*Capanelli*, 270 F.Supp.2d at 474. Although Judge Haight's ultimate decision rested on the fact that the there was no proof at trial about how much money was actually in the Credit Union, he also suggested that—given that the business of credit unions is essentially to cash employees checks and fill out loan applications-it was counter intuitive to believe that there was anywhere near $1.5 million available for the taking. *Capanelli*, 270 F.Supp.2d at 476.

Russo argues that Judge Haight's determination that the Government did not prove the intended loss amount at Campanelli's trial, means that the Government could not prove any intended loss for him and that his attorney provided ineffective assistance for not challenging the loss adjustment in his plea agreement.

Whether the evidence at Campanelli's trial was sufficient to add a 5–level adjustment to Campanelli's total offense level is debatable. However, even if I were to agree with Judge Haight conclusion that the evidence did not warrant any loss adjustment to Campanelli's offense level (and I do not), it does not necessarily follow that Russo could not rightly agree that he intended to steal that amount. If Judge Schwartz had held a sentencing hearing and required the Government to prove the

intended loss amount in the plea agreement, the Government might very well have put on evidence of the actual amount of funds on hand in the Credit Union at the time of the planned robbery-the very evidence the Government steered away from at the behest of the New York Times. However, there was no reason for Judge Schwartz to hold such a hearing; neither the Government nor the petitioner disputed the loss amount in the plea agreement. According to the Government, the final plea agreement was the result of extensive plea negotiations and reflects significant concessions by the Government. (Gov't Memo. in Opp. at 32). The Government states that "as a result of extensive negotiations with Russo's counsel, as well as counsel for codefendant Elio Albanese, the Government did not press for a 5–level enhancement for the use of guns, *an enhancement that was sought by the Government against Campanelli and applied by Judge Haight to Campanelli's sentence.*" *Id.* (emphasis added). Government also argues that it could have sought, but chose not to seek, an enhancement or adjustment based on the fact that the offense contemplated the restraint of the security guards stationed outside of the Credit Union. *Id.*

Russo's attorney negotiated with the Government to get the best plea agreement he could for his client. It is clear from the transcript of the plea proceedings that Russo completely understood the terms of the agreement, discussed the terms of the agreement with his attorney and ultimately agreed to be bound by the agreement. Russo, no doubt, was convinced that if the Government were put to the test, it could have proved what he obviously believed that there was over $1.5 million in the Credit Union. Judge Haight's determination that the Government did not prove any loss amount at Campanelli's trial does little to undermine the fact that Russo agreed with the Gov-

ernment that the intended loss was between $1.5 million and $2.5 million. Judge Schwartz was satisfied that Russo's plea of guilty was knowing and voluntary and that his assent to the intended loss amount and other guidelines calculations was an informed and calculated decision.

Petitioner has failed to show that the inclusion of the 5–level adjustment to his total offense level for intended loss resulted in a miscarriage of justice that would warrant reaching the merits of his time-barred constitutional claim of ineffective assistance of counsel. *Schlup v. Delo,* 513 U.S. 298, at 316, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (showing of innocence by petitioner must be so strong as to undermine confidence in the result of the trial and require review of the merits of the constitutional claims). Since petitioner has not made a credible showing of actual innocence, I need not consider whether the United States Constitution even requires an "actual innocence" exception to the AEDPA statute of limitations.

Accordingly, the petition is dismissed.. The Clerk of the Court is instructed to close this case and remove it from my docket.

As the Petition presents no questions of substance for appellate review, no certificate of probable cause shall issue. *Rodriquez v. Scully,* 905 F.2d 24 (2d Cir.1990); *Alexander v. Harris,* 595 F.2d 87, 90–91 (2d Cir.1979). I certify, pursuant to 28 U.S.C. § 1915(a), that an appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).